IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**UNITED STATES OF AMERICA,**

**v.**                              **CRIM. NO. 3:19CR00160-003**

**SHEHZADKHAN K. PATHAN,**
       **Defendant.**

**POSITION OF THE DEFENDANT WITH RESPECT
TO THE DEFENDANT'S SENTENCING FACTORS
AND MOTION FOR VARIANCE SENTENCE**

COMES NOW, the defendant, Shehzadkhan K. Pathan, by counsel, and hereby submits his position with respect to sentencing factors, reserving the right to amend, modify or supplement this Position should it become appropriate. The defendant further requests that this Honorable Court grant his motion for a variance sentence based on the grounds stated herein.

I.   The Advisory Guidelines Range

The defendant acknowledges that this Honorable Court must consider the advisory guideline range and other relevant sentencing factors as outlined in 18 U.S.C. § 3553(a). See United States v. Hughes, 396 F.3d 374, 377-378 (4th Cir. 2005). The probation officer has determined that the offense level is 38 and the criminal history category is I. The defendant had lodged objections regarding amount of loss, vulnerable victim, and use of an unauthorized access device.

The defendant objects to the probation officer's calculation of loss as a total amount of $10,197,482.47. The statement of facts stipulated that the defendant was involved in the conspiracy from sometime prior to 2019 until June of 2019. The defendant objects to evidence of loss that occurred subsequent to the parties' stipulated dates of involvement in the conspiracy. Subsequent to the defendant's plea of guilty, the Government obtained information related to a victim counsel will identify as SM. The amount of loss incurred by SM was approximately $1,200,000; of this amount, $743,689.20 occurred beyond the stipulated loss date of June of 2019. SM continued to send money well after Mr. Pathan was incarcerated. Excluding only this loss reduces the total loss to $9,453,793.50, less than the $9,500,000.00 threshold.

The discovery materials provided detail other losses to which the defendant objects, including where victims were never interviewed, were never identified or where dates of loss were unknown. Several examples demonstrate the defendant's concerns over inclusion of these alleged losses. One entry in the loss calculation lists $60,000.00 where the alleged victim both denied sending money or behind defrauded. There is an entry of $350,000.00 where the materials contain no information regarding when money was sent, who it was sent to, or who received it. Finally, there is evidence included in the loss calculation that occurred in April of 2020, months after the defendant was incarcerated on December 12, 2019. The Government has alleged that Mr. Pathan was a mastermind of this scheme to defraud victims. By agreement with the Government in the statement of facts, he was involved through June of 2019. He has been incarcerated since December 12, 2019; it cannot be said to be reasonably foreseeable to him that the fraud would continue beyond his agreed-to involvement in June of 2019 or beyond his arrest. Based

on the foregoing, the defendant objects to the assessment of loss amount under 2B1.1(b)(1)(K), and submits an 18 point enhancement is appropriate.

The defendant further objects to the probation officer's two-point enhancement under 2B1.1(b)(11)(B)(i) for the use of an unauthorized access device or counterfeit access device. The basis of this enhancement is apparently the fake driver's licenses utilized to retrieve packages by other co-conspirators. Application Note 10(A) states "counterfeit access device" has "the meaning that term is given 18 U.S.C. § 1029(e)(2) and . . . includes a telecommunications instrument that has been modified or altered to obtain unauthorized use of telecommunication service." The defendant submits that this is inapplicable to his case. The same note states that "unauthorized access device" "has the meaning given that term in 18 U.S.C. § 1029(e)(3), which states that it means "any access device that is lost, stolen, expired, revoked, canceled, or obtained with the intent to defraud," and further defines "access device" as "any card, plate, code, account number electronic serial number, mobile identification number, personal identification number . . . or any other means of account access that can be used . . . to obtain money, goods, services, or any other thing of value, or that can be used to initiate the transfer of funds." The defendant submits that the driver's licenses were simply used to identify the recipient of packages at the stores where items were shipped. In United States v. Carver, 916 F.3d 398, 403 (4th Cir. 2019), the Fourth Circuit held that "[t]o meet the criteria of unauthorized access device under 18 U.S.C. § 1029(e)(3) . . . the government did not need to show that each device was currently functional, but only that it was in principle **the sort of thing that people use to obtain money** (like a credit card or bank

number)(emphasis added)." Based on the foregoing, the defendant objects to the 2-point enhancement for use of an unauthorized access device or counterfeit access device.

Finally, the defendant objects to the probation officer's enhancement for "vulnerable victim" pursuant to USSG 3A1.1(b)(1) which states "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." Application Note 2 states "'vulnerable victim' means a person (A) who is the victim of the offense of conviction . . . and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." For the vulnerable victim enhancement to apply, the record must show that (1) the victim of the offense was unusually vulnerable and (2) the defendant knew or should have known of the victim's unusual vulnerability. United States v. Llamas, 599 F.3d 381, 388 (4th Cir. 2010). The enhancement thus "requires a fact-based explanation of why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability." Id.

To support this enhancement, the probation office relies on a text exchange where Mr. Pathan states "76 year old is he." There is no explanation of why this gentlemen's age "made . . . him unusually vulnerable to the offense conduct." The probation officer also relies on evidence of "reloading," as discussed in United States v. Shephard, 892 F.2d 666 (4th Cir. 2018), and lists twenty victims as being victims of this alleged reloading scheme. Of the twenty victims, the probation officer *assumes* that nine (9) were contacted multiple times based on when packages were shipped. One of the twenty (20) listed victims sent packages after Mr. Pathan was incarcerated. It is important to note that

the Court stated in Shepard that it was not deciding "whether the mere practice of reloading (without more) will always justify applying the vulnerable victim enhancement." As stated by the dissent in Shepherd, the evidence does not demonstrate "a fact-based explanation of why advanced age or some other characteristic made one or more victims unusually vulnerable to the offense conduct, and why the defendant knew or should have known of this unusual vulnerability" as required by Llamas. The Government is asking the Court to presume vulnerability—whether by age, physical or mental condition—and apply this enhancement. The defendant objects.

The defendant states that in the absence of the objected-to enhancements, the correct offense level is 32 and the correct guidelines range is 121-151 months.

  A. Nature and Circumstances of the Offenses

Mr. Pathan entered pleas of guilty to the felony offenses of Conspiracy to Commit Mail and Wire Fraud and Aggravated Identity Theft. While there can be and is absolutely no dispute about the seriousness of these offenses, Mr. Pathan pleaded guilty and accepted responsibility for all of his criminal conduct.

  B. History and Characteristics of the Defendant

Mr. Pathan is 40 years old was born and raised in a traditional Muslim home in Ahmebedada, Gujarat, India. PSI ¶ 81. He graduated high school and attended college while still living at home. PSI ¶ 81. His father, 71 and a retired school principal, and his mother, 68 and a housewife, both still live in India and take medication for high blood pressure. PSI ¶ 83. Mr. Pathan has two siblings who are married and live with their children in India. PSI ¶ 84.

Mr. Pathan is married to a woman he met in high school and with whom he has three children, ages 15, 12 and 3. PSI ¶ 87. His family currently lives with Mr. Pathan's parents, presumably being supported by Mr. Pathan's father's pension. Mr. Pathan has a special needs child who was born premature; he receives life skills classes and an occupational therapist comes to the home twice a week. PSI ¶ 87. Mr. Pathan has been incarcerated since his arrest on December 12, 2019. PSI ¶ 2.

Mr. Pathan suffers from high blood pressure, migraines and vertigo. PSI ¶ 89. He is otherwise of good physical and mental health and as a Muslim, does not consume alcohol or illicit drugs. PSI ¶ 91-92. Mr. Pathan reports he was gainfully employed from 2003 until 2015 for Tata Communications and was self-employed from 2015 until 2019. PSI ¶ 96-97.

    C.    <u>The Factors of Section 3353</u>

    <u>(i) Need for the sentence to reflect the seriousness of the offense, to promote respect for Law, and to provide just punishment for the offense</u>.

The defendant submits that a total aggregate sentence of 150 months will reflect the seriousness of the offense, promote respect for the law and serve as just punishment. Mr. Pathan has no prior criminal record and has never been previously incarcerated; based upon his role in these offenses, he has now been held for nearly two (2) years prior to sentencing. Given his lack of prior record or incarceration, the requested sentence will meet this sentencing goal.

    <u>(ii)  Need to afford adequate deterrence to criminal conduct</u>.

The requested sentence is a harsh one, particularly for a defendant who has never been previously incarcerated and who will be detained in a foreign country to which he

has minimal ties and absolutely no support of family. It will clearly afford deterrence of the future crimes the defendant *may* commit, as well as general deterrence.

        (iii) <u>Need to protect the public from further crimes of the defendant</u>.

The requested sentence of 150 months will protect the public from crimes Mr. Pathan *may* commit in the future.

        (iv) <u>Need to provide the defendant with needed educational or vocational training, medical treatment, or other correctional treatment in the most effective manner</u>.

The defendant is a high school and college graduate and has maintained a steady work history. He does not consume alcohol or illicit drugs.

        (v) <u>Kinds of sentences available</u>.

Mr. Pathan acknowledges that a sentence if incarceration is the only available sentence for his offenses.

        (vi) <u>Need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.</u>

This Honorable Court recently sentenced James Leonard Smith to 14 years in prison for convictions of conspiracy to commit wire fraud, wire fraud and money laundering. Newspaper accounts of the case detail that Mr. Smith pleaded not guilty and proceeded to have a four-day jury trial. [Midlothian man gets 14 years in prison in $5.7 million fraud | Crime News | richmond.com](#) Similar to Mr. Pathan, Mr. Smith had no prior record. Mr. Smith had two co-defendants who were convicted of the same crimes after proceeding to trial. According to a newspaper account of the proceedings, James Michael Johnson, who also pleaded guilty and proceeded to trial, was sentenced by this

Honorable Court to eight years and one month in prison. [Former Richmond investment advisor sentenced in $13 million fraud scheme | Crime & Courts | dailyprogress.com](). It is important to note that the conspiracy was referred to as a "$13M international fraud scam." The final co-defendant, Stuart Jay Anderson, a lawyer, was sentenced to 4 years in prison for his role in this scheme.

The defendant cites the case of United States of America v. Michael Cooper, heard by the Honorable Robert E. Payne. According to the Department of Justice press release, Mr. Cooper "led a $9M nationwide credit card scheme" and was sentenced to 10 years in prison. [Man Sentenced For $9 Million Credit Card Refund Scheme | USAO-EDVA | Department of Justice](). Mr. Cooper had no prior record.

Thus far, three of the defendant's co-defendants have been sentenced. Chirag Choksi was sentenced to a total aggregate sentence of 78 months. Shachi Majmudar was sentenced to 14 months. Javeshkumar Deliwala was sentenced to 63 months. The requested sentence is far in excess of that of any of the defendant's co-defendants, yet still accounts for the significant role he played in these offenses.

The defendant submits that the requested aggregate sentence of 150 months is appropriate in this case, in light of other, similar cases cited herein. It is important to note that Mr. Pathan pleaded guilty and accepted responsibility for his crimes; Mr. Smith and Mr. Johnson proceeded to trial and were convicted of similar offenses with an identical record.

(vii) <u>Need to provide restitution to any victims of the offense</u>.

The defendant's restitution obligation is substantial. The defendant submits that the requested sentence allows him a more reasonable opportunity to return to the work

force and being paying restitution than the currently recommended sentencing guideline range.

### III. Request for Variance Sentence

To the extent the Court overrules the defendant's objections and finds that the appropriate sentencing range is 235-240 months for conspiracy, Mr. Pathan respectfully requests that the Court impose a variant sentence of 150 months total.

Post-*Booker*, a sentencing court must engage in a multi-step process that begins with correctly determining the defendant's Guideline range. United States v. Moreland, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must determine whether a sentence within that range . . . serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *Id*. (alterations in original) (internal quotation marks omitted). "In doing so, the district court should first look to whether a departure is appropriate based on the Guidelines Manual or relevant case law." *Id*. If it is, the court may depart, or if the "departure range still does not serve the factors set forth in § 3553(a), the court may then elect to impose a non-guideline sentence (a 'variance sentence')." Id. As part of this process, "[t]he district court must articulate the reasons for the sentence imposed, particularly explaining any departure or variance from the guideline range." Id.

"Variant" sentences are drawn from consideration of the sentencing factors set forth in § 3553(a). See Irizarry v. United States, 553 U.S. 708, 714-15 (2008); see also United States v. Rivera-Santana, 668 F.3d 95, 100 n.6 (4th Cir. 2012) (discussing the difference between a departure, a sentence imposed by reference to the defendant's

guidelines range, and a variance, "a non-Guidelines sentence" that is justified on the basis of the § 3553(a) factors) (citation omitted).

Mr. Pathan respectfully requests that the Court consider a variant sentence, given his lack of record, his medical issues, his lengthy separation from his family, and the impact his incarceration has had and will continue to have on his family during the service of his sentence.

As argued above and demonstrated by the pre-sentence report, Mr. Pathan has no prior criminal record whatsoever. Prior to this prosecution, he has never spent any time incarcerated; he has now been held since December 12, 2019—nearly two years— awaiting his sentencing hearing.

Mr. Pathan suffers from high blood pressure, which is associated with increased risk of infection. [COVID 19 and high blood pressure Cause for concern | VCU Health](#) It cannot be disputed that prison inmates are at greater risk of contracting the disease than the general public. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), [https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html](https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html). The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family,

> legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.*

Because of these dangers, the public health community is insistent on the critical need to rapidly reduce our prison populations, both for the health of our inmates and the health of the community as a whole:

> It is . . . an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible . . . Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Beyrer Dec., ¶¶ 34, 36.

Mr. Pathan has virtually no ties here in the United States. As detailed above, Mr. Pathan has been incarcerated since December 12, 2019; during this time, he has been incarcerated during a global pandemic and has not been able to see his family members. Separated from his family, he is without any support system or ability to have in person contact with his family. Mr. Pathan's family cannot engage in regular visitation with him given the fact they reside in India. The lengthy period of time away from his family, including his wife, his elderly parents and his young children, including a special needs son, are certainly factors the average federal defendant does not have to contend with. Mr. Pathan leaves an unemployed wife and three young children behind; they live with his parents, who are apparently surviving on Mr. Pathans' father's pension. Mr. Pathan submits that separation from his family and its obvious impact upon them is a factor that, when considered with other factors described herein, warrant a total aggregate sentence of 150 months.

The defendant submits that his age at the time of his release under his requested sentence is a significant mitigating factor. Mr. Pathan is a first time felony defendant who has never before been in trouble or been in jail. He is currently 40 years old and is requesting a sentence in excess of twelve (12) years; he would not be released until he was in his fifties, and would be subjected to three years of supervision upon his release from incarceration. In December of 2017, the United States Sentencing Guideline Commission released its fourth report in an ongoing recidivism study. The report "examined the impact of the aging process on federal offender recidivism and the impact of other offense and offender factors once age is accounted for," and found that "older offenders are substantially less likely to recidivate following release compared to younger cohorts." It also found that "[o]lder offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average." See U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (December 7, 2017). Mr. Pathan submits that his age at the time of his release when coupled with his acceptance of responsibility and other mitigating factors described herein make him a low risk to reoffend.

Mr. Pathan submits that a total aggregate sentence of 150 months is adequate, but not longer than necessary, to meet the requirements of 3553 and respectfully requests that the Court impose this variant sentence.

IV.     Conclusion

For the foregoing reasons, the defendant respectfully requests that this Honorable Court sentence him to serve one-hundred fifty (150) months followed by a period of supervised release.

                                    Respectfully submitted,

                              By:_____/s/_____
                                       Counsel

Gregory R. Sheldon, Esquire
9030 Three Chopt Road
Suite B
Richmond, Virginia 23229
T: (804) 282-8625
F: (804) 282-8629
gsheldon@bainsheldon.com
VSB: 44538

### *CERTIFICATE*

      I certify that on September 9, 2021, I electronically filed the foregoing Position on Sentencing and Request for Variance Sentence with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing (NEF) to:

                        Brian Hood, Esquire
                        U.S. Attorney's Office
                        Suntrust Building
                        919 E. Main Street
                        Suite 1900
                        Richmond, Virginia 23219
                        Brian.Hood@usdoj.gov

                                  _____/s/_____
                                      Gregory R. Sheldon
                                      Counsel for Defendant